727 F.2d 633
 Jerome SKLAR, Plaintiff-Appellant,
v.
Jane M. BYRNE, individually and as Mayor of the City of
Chicago, and Richard J. Brzeczek, individually and
as Superintendent of the Chicago Police
Department, Defendants-Appellees.
 No. 83-1431.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 26, 1983.
Decided Feb. 8, 1984.
As Amended April 17, 1984.
 
 Edward B. Arnolds, John Marshall Law School, Chicago, Ill., for plaintiff-appellant.
 Maureen Kelly Ivory, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellees.
 Before PELL and CUDAHY, Circuit Judges, and WILKINS, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 This case presents a challenge to the constitutionality of Chicago's laws regulating the possession and registration of handguns. The plaintiff-appellant contends that the city has violated the equal protection clause of the fourteenth amendment by discriminating against persons who have moved or will move to Chicago after the effective date of the ordinance, April 10, 1982. He seeks both a declaration that the ordinance is invalid and a permanent injunction against the enforcement of its restrictions on the registration of handguns by new residents. The district court dismissed the complaint for failure to state a claim upon which relief could be granted, and we affirm 556 F.Supp. 736.
 
 I.
 
 2
 On March 19, 1982, the Chicago City Council passed an ordinance amending Chapter 11.1 of the Municipal Code of the City of Chicago which regulates the sale, possession and registration of firearms and ammunition. The ordinance requires that all firearms in Chicago be registered with the city. Chicago, Ill., Municipal Code Sec. 11.1-2.[1] The ordinance also classifies some firearms as "unregisterable," thus making illegal their possession in the City of Chicago.[2] Among the categories of "unregisterable" firearms are "Handguns, except those validly registered to a current owner in the City of Chicago prior to the effective date of this Chapter." Chicago Municipal Code Sec. 11.1-3(c)(1). The effective date of the Chapter was April 10, 1982. The classification in section 11.1-3(c)(1) is the subject of the plaintiff's equal protection challenge.
 
 
 3
 This language in section 11.1-3(c)(1) thus limits the legal supply of handguns in the City of Chicago to those lawfully registered with the city on the effective date and prevents any Chicago citizen who did not own a registered handgun on the effective date from lawfully purchasing, registering and possessing a handgun in Chicago.[3]
 
 
 4
 On April 10, 1982, plaintiff Jerome Sklar lived in the Chicago suburb of Skokie, Illinois. According to his complaint, he then owned a handgun and possessed a valid Illinois Firearms Owner Identification Card. On April 15, 1982, just five days after the Chicago handgun ordinance took effect, the plaintiff moved to Chicago. According to his affidavit, he would like to keep his handgun at his home in Chicago for personal protection and for "lawful recreational handgun-related activity." The ordinance prevents him from keeping his gun in his home because it was not "validly registered to a current owner in the City of Chicago" before April 10, 1982. Chicago Municipal Code Sec. 11.1-3(c)(1). The plaintiff argues that the ordinance violates the equal protection clause of the fourteenth amendment because it creates an unconstitutional classification based upon residence. He contends that the ordinance discriminates against new residents of Chicago who either own or wish to own handguns.
 
 
 5
 The plaintiff brought his complaint under 42 U.S.C. Sec. 1983, alleging that city officials are depriving him of his rights under the federal Constitution. He named as defendants the then mayor of Chicago and superintendent of the Chicago police department. The defendants moved to dismiss the complaint for failure to state a claim upon which relief could be granted. The district court granted the motion to dismiss the federal claim a decision issued February 14, 1983. 556 F.Supp. 736.[4] The district court relied upon our decision in Quilici v. Village of Morton Grove, 695 F.2d 261 (7th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983), and concluded that the Chicago firearms ordinance does not infringe any federal constitutional right. Therefore, the district court applied the "rational basis" standard of review appropriate to equal protection analysis where a statute does not impinge upon a fundamental right or employ a suspect classification. The district court concluded that the ordinance rationally furthers a legitimate governmental purpose and does not violate the equal protection clause. We agree that the ordinance requires only rational basis review, and we agree that the ordinance meets the standard. Therefore, we affirm the district court's dismissal of the complaint.
 
 II.
 
 6
 The first question we face in this appeal is the appropriate standard for our review of the classification scheme in the handgun ordinance. The standard of review depends upon the character of the legislative classification and the nature of the individual interests at stake. Where the legislative classification works to the disadvantage of a constitutionally suspect class--based, for example, on race, nationality, alienage or religious affiliation--then courts may uphold the classification only if it is "precisely tailored to serve a compelling governmental interest." Plyler v. Doe, 457 U.S. 202, 216-17 & n. 14, 102 S.Ct. 2382, 2394-95 & n. 14, 72 L.Ed.2d 786 (1982). Similarly, if the legislative classification impinges upon the exercise of a fundamental personal right, the classification must meet the same exacting "compelling interest" standard. 457 U.S. at 216-17, 102 S.Ct. at 2394-95. If the legislative classification neither impinges on a fundamental personal right nor employs an inherently suspect classification, courts will generally uphold the classification if it is rationally related to a legitimate state interest, or, as the Supreme Court phrased the issue in Plyler v. Doe, if it "bears some fair relationship to a legitimate public purpose." 457 U.S. at 216, 102 S.Ct. at 2394.[5] Here we attempt to follow the Supreme Court's pattern of analysis by examining the nature of the personal rights affected by Chicago's ordinance and the character of the classification in the ordinance.
 
 
 7
 The Chicago handgun ordinance does not impinge upon any federal constitutional right to bear arms. This court held recently that the second amendment regulates only the activities of the federal government--not those of the states or their subdivisions. Quilici v. Village of Morton Grove, supra, 695 F.2d at 269-71. Nor is the asserted right to bear arms pivotal in the effective exercise of constitutionally guaranteed rights. See San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 102, 93 S.Ct. 1278, 1332, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting) ("The task in every case should be to determine the extent to which constitutionally guaranteed rights are dependent on interests not mentioned in the Constitution."). Therefore, the second amendment does not require us to apply the compelling governmental interest standard to this ordinance.
 
 
 8
 Plaintiff urges that the ordinance also infringes a fundamental right guaranteed by the Illinois Constitution. Article I, section 22 of the Illinois Constitution provides: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." According to plaintiff, section 22 creates a fundamental personal right upon which the Chicago ordinance impinges, and the ordinance's classification scheme is therefore subject to compelling state interest review under the equal protection clause of the fourteenth amendment. Plaintiff is correct in so far as he contends that a state may not arbitrarily discriminate among its citizens when it creates state rights, whether statutory or constitutional. Several Supreme Court decisions have upheld equal protection challenges to state laws which created state rights but did so with a classification scheme which was arbitrary. See, e.g., Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (right to vote in state elections); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (right to appeal criminal conviction).
 
 
 9
 Examination of section 22, however, demonstrates that an individual's right to bear arms in Illinois is narrow and subject to extensive regulation. First, the individual's right to bear arms is expressly "subject" to the "police power." Section 22 thus gives the state and municipalities wide latitude to regulate the private possession of firearms in order to protect the public health, safety and welfare. Second, the right is only a qualified right to bear some unspecified "arms" rather than a right to bear any particular type of firearm.[6] These two limitations on section 22 permit a municipality to prohibit all private possession of handguns. Quilici v. Village of Morton Grove, supra, 695 F.2d at 267; Kalodimos v. Village of Morton Grove, 113 Ill.App.3d 488, 69 Ill.Dec. 414, 447 N.E.2d 849, 852 (1983), leave to appeal granted, No. 58467 (Ill.Sup.Ct. October 4, 1983). In the case before us, of course, the city has exercised its police power to restrict the availability of firearms. Since the state constitutional right is narrowly circumscribed by the police power, the fact that the Chicago ordinance as a whole affects the right does not trigger compelling state interest analysis of the ordinance.
 
 
 10
 Plaintiff's strongest argument in favor of compelling state interest review here is that the ordinance disadvantages new residents of Chicago and that this classification is suspect because it depends upon residence and implicates the federally protected right to travel.[7] Plaintiff correctly asserts that courts have in some cases applied a heightened level of scrutiny where the state has created rights and limited their availability to individuals depending in part upon the duration of their residence. See Memorial Hospital v. Maricopa County, 415 U.S. 250, 254, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974) (access to free medical care); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (eligibility for welfare benefits). Durational residence requirements are subject to heightened scrutiny because they may penalize exercise of the right to travel, which is a personal right fundamental to our system of government.
 
 
 11
 However, the classification in the Chicago ordinance is not a durational residence requirement, and the ordinance's effect on travel is only indirect. Section 11.1-3(c)(1) creates two classes of handguns. First, handguns "validly registered to a current owner in the City of Chicago" prior to the effective date of the ordinance may be registered with the city, and their possession in Chicago is lawful for those who owned them on the effective date. All other handguns, with exceptions not relevant here, constitute a second class of handguns which are "unregisterable." The ordinance therefore outlaws their possession in Chicago. As a new resident of Chicago, moving there five days after the effective date of the ordinance, plaintiff may not lawfully purchase, possess and register handguns in the city.
 
 
 12
 The classification scheme in the ordinance does not, however, single out new residents of Chicago for discriminatory treatment. Under section 11.1-3(c)(1), a person may lawfully possess a handgun in Chicago only if he or she (1) owned the handgun before the effective date; (2) was a resident of Chicago on the effective date; and (3) registered the handgun with Chicago before the effective date. Anyone who did not own a registered handgun in Chicago on the effective date may not now possess a handgun in Chicago. Among the groups affected, therefore, are new residents of Chicago, all persons living in Chicago on the effective date who did not own a handgun and all persons who owned handguns in Chicago but had not registered them before the effective date. The ordinance thus outlaws the private possession of handguns in Chicago, but it makes an exception for handguns owned and registered in Chicago on the effective date of the ordinance.
 
 
 13
 The ordinance also sharply curtails the rights of those who fall within the exception for handguns owned and registered in Chicago on the effective date. They may keep the registered handguns they owned at the time. But they may not sell or give away their handguns in Chicago, nor may they purchase and keep additional handguns in Chicago. The ordinance thus effectively freezes the current distribution of legal handguns in Chicago and prohibits their owners from replacing the guns they now own.
 
 
 14
 The handgun provisions of the ordinance amount to a familiar grandfather clause. Rather than ban all private possession of handguns, the city enacted an ordinance which said, in effect, "So much and no more." Those who already owned registered handguns could keep them (and they may not sell the handguns in Chicago), but additional handguns in the city were prohibited. The grandfather clause thus has only an indirect effect on the freedom to travel, as new residents are merely one group among several who do not benefit from the clause. New residents have not been singled out for discriminatory treatment. Cf. Zobel v. Williams, 457 U.S. 55, 58-59, 102 S.Ct. 2309, 2311-2312, 72 L.Ed.2d 672 (1982) (distribution of state benefits based solely on duration of residence).
 
 
 15
 Grandfather provisions always grant preferences to a special group, and newcomers or those who never arrive in the favored area rarely share the benefits. We recognize that such clauses create a risk of political exploitation working to the disadvantage of unfavored classes, and courts must certainly scrutinize grandfather clauses to learn whether they are masks for exploitation or invidious discrimination. E.g., Guinn v. United States, 238 U.S. 347, 364-65, 35 S.Ct. 926, 931, 59 L.Ed. 1340 (1915) (grandfather clause used to violate fifteenth amendment voting rights). See Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth., 641 F.2d 1087, 1095-96 (3rd Cir.1981) (dangers of grandfather clauses).
 
 
 16
 However, in challenging a grandfather clause such as that incorporated in the handgun ordinance here, plaintiffs cannot invoke compelling governmental interest scrutiny by showing only that new residents will not share its benefits. Grandfather clauses almost always favor established residents or businesses over newer ones. See, e.g., City of New Orleans v. Dukes, 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (upholding grandfather clause protecting established businesses and eliminating newer competition). Where the purpose of the grandfather clause is the protection of reliance interests, only established residents or businesses will have relied on prior laws and thus will have reliance interests to protect.
 
 
 17
 If compelling governmental interest scrutiny were appropriate based merely on a showing that newer residents would not benefit from the provision, then virtually any grandfather clause would be vulnerable under that exacting standard. Few would be likely to withstand scrutiny. Yet grandfather provisions are a familiar means in the law for protecting reliance interests, and we are reluctant to unsettle these provisions by applying an unnecessarily demanding standard of review. Where plaintiffs can show that a grandfather provision impinges on a fundamental personal right (other than through its indirect effects on those who travel), or that the provision is a substitute for a suspect form of discrimination, courts should apply the compelling governmental interest standard. In this case, however, the provision does not impinge upon fundamental rights, nor is it a subtle mask for invidious discrimination. Under the equal protection clause, we therefore ask whether the challenged classification rationally furthers a legitimate governmental purpose. See City of New Orleans v. Dukes, supra 427 U.S. at 303, 96 S.Ct. at 2516.[8]III.
 
 
 18
 The Chicago handgun ordinance as a whole promotes legitimate government goals. The city council set forth its purposes in the preamble to the ordinance. The council found that handguns and other firearms play a major role in crimes and accidental deaths and injuries, and that the "convenient availability" of firearms and ammunition contributed to deaths and injuries in Chicago. The council therefore enacted the ordinance to restrict the availability of firearms and thereby to prevent some deaths and injuries among Chicago citizens.[9] The city's primary goals are thus classic examples of the city's police power to protect the health and safety of its citizens.
 
 
 19
 The goals of the whole ordinance are certainly legitimate, and this court has no basis for concluding that the ordinance is not rationally calculated to reduce the supply of handguns in Chicago in order to protect the safety of Chicago residents. However, the fact that the ordinance as a whole furthers legitimate state purposes does not end our inquiry. Even where the governmental goal is legitimate, the government may not use arbitrary and irrational classifications to achieve its ends. E.g., Hetherton v. Sears, Roebuck & Co., 652 F.2d 1152, 1157-59 (3rd Cir.1981) (requirement that firearm purchaser be identified by two landowners held unconstitutional). See Logan v. Zimmerman Brush Co., 455 U.S. 422, 442, 102 S.Ct. 1148, 1161, 71 L.Ed.2d 265 (1982) (opinion of Blackmun, J.). Thus, we must focus our analysis on the particular classification at issue here and decide whether that classification promotes a legitimate governmental interest in a rational manner.
 
 
 20
 The classification, as we have discussed above, permits those who owned registered handguns in Chicago on the effective date of the ordinance to keep those handguns. Those persons may not purchase additional handguns, and no other person may bring additional handguns into the city. The ordinance thus provides preferential treatment for those who (a) were residents of Chicago before the ordinance took effect, (b) owned handguns and (c) registered their handguns with the city. The city says, in effect, that one group of people may own some handguns in Chicago, and other people may not own any handguns.
 
 
 21
 While most legislative enactments survive the rational basis test, the rationality standard is not "toothless." Mathews v. Lucas, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). See Zobel v. Williams, 457 U.S. 55, 65, 102 S.Ct. 2309, 2315, 72 L.Ed.2d 672 (1982) (striking down Alaska distribution system for state benefits under rationality standard). We must examine the city's classification of those who may and may not own handguns and ask what purposes it serves and whether those purposes are legitimate.
 
 
 22
 Neither the preamble to the ordinance nor the limited legislative record of the ordinance provides any clues regarding the purpose of the grandfather clause. That silence is not surprising, for the grandfather clause amounts to one line in an elaborate nine page ordinance. The absence of an articulated purpose for the classification does not prevent this court from considering purposes suggested by counsel[10] or the court itself. Of course, there are risks in courts' upholding legislation by attributing to the legislature purposes for which there is scant support in the record. The Third Circuit has examined in detail the difficulties involved in attributing to legislatures unarticulated purposes for grandfather provisions. Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth., 641 F.2d 1087, 1094-97 (3rd Cir.1981). We agree that courts must be "careful not to attribute to the legislature purposes which it cannot reasonably be understood to have entertained," 641 F.2d at 1097, but they should also be reluctant to strike down legislation which would clearly be constitutional if the legislature had merely taken the trouble to articulate its purposes more clearly.
 
 
 23
 Bearing in mind the hazards of this approach, we think it is clear that the purpose of the grandfather provision in section 11.1-3(c)(1) is the protection of the reliance interests of those who purchased handguns legally before the effective date of the ordinance. As we have discussed above, the grandfather provision is quite narrow--it applies only to those who owned handguns and registered them in Chicago under prior law. The provision reaches no further than the reliance of these people, for they relied on prior law only to the extent that they owned and registered certain specific handguns.[11] The ordinance rationally furthers the purpose of protecting those reliance interests because it is tailored to fit only actual reliance on prior law without reaching any further.[12]
 
 
 24
 The problem, then, is whether the purpose of protecting these reliance interests is a legitimate one for the government. In this field of regulation, we start with the strong presumption that legislative purposes are constitutional. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). Further, the purpose of protecting those who relied on prior laws--and only to the extent they relied on prior law--is a matter of simple fairness. Governments enact laws which invite citizens to invest their money and time and to arrange their affairs in reliance upon those laws. Laws are not immutable, but we can see no reason to prohibit governments from protecting the interests of those who rely upon prior law. The Supreme Court approved the legitimacy of reliance interests in City of New Orleans v. Dukes, supra, 427 U.S. at 305, 96 S.Ct. at 2517, where the court upheld a local ordinance protecting older businesses in a city by closing down their newer competitors. See also Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 467-68, 101 S.Ct. 715, 725-26, 66 L.Ed.2d 659 (1981) (upholding temporary grandfather provisions protecting reliance interests and preventing economic dislocations); Hennessey v. National Collegiate Athletic Ass'n, 564 F.2d 1136, 1144-45 (5th Cir.1977) (upholding "grace period" protecting reliance interests and preventing unfairness of NCAA bylaw). This court has also noted the legitimacy of reliance interests in an equal protection challenge to a grandfather clause. Trafelet v. Thompson, 594 F.2d 623, 631 & n. 11 (7th Cir.) (pension provisions for state judges), cert. denied, 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979). We conclude, therefore, that the city's purpose in protecting the reliance interests of those who purchased and registered handguns in Chicago was a legitimate purpose. The ordinance rationally furthers that purpose with its grandfather provisions tailored to fit the extent of the reliance.[13]
 
 
 25
 Plaintiff also argues that the grandfather clause is arbitrary and irrational because it is inconsistent with the overall purposes of the ordinance. He contends that where the city permits some people but not others to own handguns, and where the city's purpose is to prevent deaths and injuries, it is irrational for the city not to classify people in terms of their ability to handle handguns safely. However, that argument essentially asks this court to second-guess the judgment of the city council. The Constitution does not require the city council to act with a single purpose or to be entirely consistent. Indeed, the council is a political body for the accommodation of many conflicting interests:
 
 
 26
 A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill.
 
 
 27
 Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). This court cannot duplicate the political processes--the debates, the lobbying, the conflicts and the compromises--which produced the ordinance. The Constitution does not require the city council to enact the perfect law. The council may proceed step by step, "adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." City of New Orleans v. Dukes, supra, 427 U.S. at 303, 96 S.Ct. at 2516.
 
 
 28
 The city council concluded that handgun-related injuries and deaths could be reduced by freezing the current supply of handguns in Chicago. In weighing the competing interests involved in the decision, the council chose to protect the interests of those who had relied on prior Chicago laws permitting them to own handguns. While grandfather clauses require constitutional scrutiny for invidious forms of discrimination, the fact that the ordinance stopped short of a complete ban and protected those who relied on prior law does not violate the equal protection clause. The ordinance does not trammel fundamental personal rights or employ invidious classifications, and its provisions are fairly calculated to achieve legitimate state purposes. The judgment of the district court is therefore
 
 
 29
 AFFIRMED.
 
 
 
 *
 Honorable Philip C. Wilkins, Senior District Judge for the Eastern District of California, is sitting by designation
 
 
 [1]
 Section 11.1-2 of the Chicago Municipal Code provides in relevant part:
 (a) All firearms located in the City of Chicago shall be registered in accordance with the provisions of this Chapter. It shall be the duty of a person owning or possessing a firearm to cause such firearm to be registered. No person shall within the City of Chicago, shall [sic] possess, harbor, have under his control, transfer, offer for sale, sell, give, deliver, or accept any firearm unless such person is the holder of a valid registration certificate for such firearm. No person shall, within the City of Chicago, possess, harbor, have under his control, transfer, offer for sale, sell, give, deliver, or accept any firearm which is unregisterable under the provisions of this Chapter.
 Section 11.1-2 contains several exceptions to its registration requirements, for example, exempting firearms owned by law enforcement agencies. The exceptions are not applicable to this case involving a private citizen's desire to possess handguns in Chicago.
 A person convicted of violating Chapter 11.1 for the first time may be fined not less than $300 and not more than $500, or may be incarcerated for not less than 10 days and not more than 90 days. Subsequent convictions are punishable by fine of $500 and imprisonment of not less than 90 days and no more than six months. Sec. 11.1-23.
 
 
 [2]
 Section 11.1-3 of the Municipal Code provides in relevant part:
 No registration certificate shall be issued for any of the following types of firearms:
 * * *
 (c) Handguns, except
 (1) those validly registered to a current owner in the City of Chicago prior to the effective date of this Chapter.
 (2) those owned by Peace Officers who are residents of the City of Chicago.
 (3) those owned by security personnel.
 (4) those owned by private detective agencies licensed under Chapter 111.2601 et seq. Illinois Revised Statutes.
 
 
 [3]
 The ordinance does permit the transfer of handguns through inheritance. Sec. 11.1-3(e)
 
 
 [4]
 The district court also dismissed without prejudice plaintiff's pendent claim under the Illinois Constitution. Plaintiff is pursuing in state court his claim that the Chicago ordinance violates the equal protection provisions of the Illinois Constitution. This appeal concerns only the federal claim
 
 
 [5]
 Of course, courts do not apply these so-called "tiers of review" rigidly or with mathematical precision. Where legislative classifications have not been facially invidious but have given rise to "recurring constitutional difficulties," 457 U.S. at 217, 102 S.Ct. at 2395, the Supreme Court has required that the classification reflect "a reasoned judgment consistent with the ideal of equal protection" and inquired "whether it may fairly be viewed as furthering a substantial interest of the State." 457 U.S. at 217-18, 102 S.Ct. at 2395. This intermediate level of review has been applied, for example, to legislative restrictions on access to education, Plyler v. Doe, supra, and to classifications based on gender, Mississippi University for Women v. Hogan, 458 U.S. 718, 723-26, 102 S.Ct. 3331, 3336-37, 73 L.Ed.2d 1090 (1982), and legitimacy, Pickett v. Brown, --- U.S. ---, ---, 103 S.Ct. 2199, 2204, 76 L.Ed.2d 372 (1983)
 
 
 [6]
 Certainly the provision does not prevent the state or a city from outlawing private possession of machine guns or bazookas
 
 
 [7]
 The plaintiff in this case moved within the state of Illinois from Skokie to Chicago. He asserts that his movement within the state is protected by the federal constitution and that the Chicago ordinance penalizes that movement. The Supreme Court has expressly left open the issue whether the federal constitution protects intrastate travel to the same extent it protects interstate travel. See Memorial Hospital v. Maricopa County, 415 U.S. 250, 255-56 & n. 9, 94 S.Ct. 1076, 1080-81 & n. 9, 39 L.Ed.2d 306 (1974). The Court recently described the rationale for the right to travel in a way that might support its application to intrastate movement. See Zobel v. Williams, 457 U.S. 55, 60 n. 6, 102 S.Ct. 2309, 2312 n. 6, 72 L.Ed.2d 672 (1982) (equal protection analysis applied to distinctions between old and new residents). Certainly it would be odd if the Chicago ordinance were constitutional as applied to those who move from within Illinois and unconstitutional as applied to those who move from other states. However, we need not decide this issue here; because the ordinance has only an indirect effect on travel, the ordinance withstands equal protection challenge even if intrastate travel is federally protected
 
 
 [8]
 Legislative classifications which disadvantage nonresidents or new residents are, of course, subject to the scrutiny of courts, and we must keep in mind the inability of new residents and nonresidents to protect their interests through the political process. Plaintiff in this case was not able to participate in the political process which produced the Chicago handgun ordinance. He was at that time a resident of Skokie, Illinois, and had no reason to be involved in Chicago politics or government. But the ordinance here is unlike statutes which restrict the rights of nonresidents or of a small group of recently arrived residents. Cf. Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (durational residence requirement for free medical care); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (durational residence requirement for voting); Hicklin v. Orbeck, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (preference for hiring Alaska residents in energy industries violated privileges and immunities clause). Nonresidents and a small group of new residents with constantly changing membership may be unable to protect their interests through the political process. The groups who are disadvantaged by the Chicago handgun ordinance include those who did not own handguns, those who owned unregistered handguns and those who moved to Chicago after April 10, 1982. We have no reason to conclude that these groups have been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973)
 
 
 [9]
 The preamble to the ordinance reads:
 WHEREAS, The annual sales of firearms in the United States is [sic] ever increasing; and
 WHEREAS, Firearms, and especially hand guns, play a major role in the commission of homicide, aggravated assaults and armed robbery; and
 WHEREAS, The improper storage of firearms and ammunition is a major factor in accidental deaths and injury in homes; and
 WHEREAS, The City Council of the City of Chicago has found and determined that the convenient availability of firearms and ammunition has increased firearm related deaths and injuries; and
 WHEREAS, The City Council of the City of Chicago has found and determined that it is necessary and desirable to protect the residents of the City of Chicago from the loss of property and injury or death from firearms; and
 WHEREAS, The City Council of the City of Chicago has found and determined that proper registration of firearms in the community will aid in achieving these goals....
 
 
 [10]
 At oral argument counsel for the city suggested that the city council might have included the grandfather clause to protect the property interests of handgun owners in Chicago. The record contains no other suggestions concerning the purposes of the clause
 
 
 [11]
 The ordinance was effective three weeks after its enactment. The three week period may have provided a brief "amnesty" opportunity for those who had purchased handguns but had not yet registered them. To the extent that handgun owners who had not registered their handguns took advantage of the amnesty, the grandfather clause reached beyond its purpose of protecting reliance interests. However, we have no grounds for concluding that this discrepancy undermines the primary purpose of the grandfather provision
 The ordinance also required all owners of registered firearms (including the handguns covered by the grandfather clause) to re-register their firearms within 180 days of the effective date of the ordinance. Chicago Municipal Code Sec. 11.1-7(b). Administrative problems later led the city council to extend the deadline for re-registration until February 2, 1983. Journal of the Proceedings of the City Council of the City of Chicago, Illinois 11,713 (July 15, 1982). Because the extension applied only to those firearms already registered with the city prior to the effective date, the extension did not expand the coverage of the grandfather clause.
 
 
 [12]
 The ordinance provides only a temporary preference for the special class because the owners of registered handguns on the effective date may not replace those guns. The ordinance thus appears to be a first step in a gradual approach to the problems of handgun violence. See Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth., supra, 641 F.2d at 1098 (temporary preferences may be legitimate means for legislature adopting gradual solutions to problems)
 
 
 [13]
 If the ordinance had said that all residents of Chicago on the effective date could own handguns and that all those who moved later to Chicago could not, the classification would be unlikely to survive constitutional challenge. See Hicklin v. Orbeck, 437 U.S. 518, 525-26, 98 S.Ct. 2482, 2487-88, 57 L.Ed.2d 397 (1978) (privileges and immunities clause). It is difficult to conceive of a legitimate state purpose for such a classification. The narrow grandfather clause in the Chicago ordinance, by contrast, addresses a legitimate purpose and affects travel only indirectly