CITIZENS FOR RESPONSIBLE ENVIRONMENTAL MANAGEMENT
& another[1] *vs.* ATTLEBORO MALL, INC.[2]

Suffolk. April 8, 1987. — August 12, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Administrative Law,* Regulations, Agency's interpretation of statute, Judicial
review. *Regulation. Wetlands Protection Act. Municipal Corporations,*
Conservation commission. *Department of Environmental Quality En-
gineering.*

Regulations promulgated in 1983 by the Department of Environmental Qual-
ity Engineering which, with certain exceptions, prohibited approval of
any wetland alteration proposal which would result in the loss of more
than 5,000 square feet of "bordering vegetated wetland" did not, by
reason of a "grandfather" provision permitting proposals already under
consideration at the time the 1983 regulations were adopted to undergo
case-by-case review in accordance with prior agency regulations, violate
the broad legislative mandate accorded to the agency by the Wetlands
Protection Act, G. L. c. 131, § 40. [667-671]
With respect to a proposal for construction of a shopping mall on a "bordering
vegetated wetland," the Department of Environmental Quality Engineer-
ing acted properly within the broad legislative mandate accorded to it
by the Wetlands Protection Act, G. L. c. 131, § 40, as well as within
its technical expertise, in determining that review under a "grandfather"
provision in certain restrictive regulations would not infringe upon
statutorily protected interests, and in concluding, on conflicting evidence,
that a proposed scheme for recreating functional wetlands would be
feasible. [671-672]
Where the Department of Environmental Quality Engineering issued an
order of conditions under the Wetlands Protection Act, G. L. c. 131,
§ 40, respecting the construction of a shopping mall on a "bordering

---

[1] The plaintiffs are a group of citizens who reside near a site that the
defendant proposes to develop. The Massachusetts Association of Conser-
vation Commissions is also a plaintiff. The Conservation Law Foundation
of New England has submitted a brief as amicus curiae.

[2] The Department of Environmental Quality Engineering in the Executive
Office of Environmental Affairs was also named as a defendant in this
action, but it has not participated in this appeal.

vegetated wetland" which superseded a prior order issued by the conservation commission of the city in which the mall was to be located, remand to the local commission for further consideration was not required, in view of the circumstances that the conditions imposed by the agency were found by it to reduce the environmental impact of a project previously approved at the local level, and that local residents had had full opportunity to participate in the process of review. [672-675]

CIVIL ACTION commenced in the Superior Court Department on May 17, 1985.

The case was heard by *Cortland A. Mathers,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*R. Robert Popeo (Michael S. Gardener* with him) for Attleboro Mall, Inc.

*F. Anthony Mooney (Anne E. Renner* with him) for Citizens for Responsible Environmental Management.

*Gregor I. McGregor (Cynthia L. Amara* with him) for Massachusetts Association of Conservation Commissions.

*Peter Shelley & Sarah R. Newbury,* for Conservation Law Foundation of New England & others, amici curiae, submitted a brief.

LIACOS, J. The defendants are Attleboro Mall, Inc. (applicant), which seeks to construct a shopping mall on a site known as Sweeden's Swamp in Attleboro, and the Department of Environmental Quality Engineering (DEQE), which reviewed and approved the applicant's plans pursuant to the Wetlands Protection Act (WPA), G. L. c. 131, § 40.[3] The applicant appeals from an order by a judge of the Superior Court, which nullified DEQE's approval and remanded the matter to the

---

[3] The statute, as then in effect, provided in pertinent part: "No person shall remove, fill, dredge or alter any bank, fresh water wetland, coastal wetland, beach, dune, flat, marsh, meadow or swamp bordering on the ocean or on any estuary, creek, river, stream, pond, or lake, or any land under said waters or any land subject to tidal action, coastal storm flowage, or flooding . . . without filing written notice of his intention to so remove, fill, dredge or alter, including such plans as may be necessary to describe

agency for further review. G. L. c. 30A, § 14 (1) (1984 ed.). We reverse the judge's order and affirm the ruling by DEQE.

Efforts to build on Sweeden's Swamp began in February, 1979, when a developer known as Mugar Group, Inc./Federated Stores Realty, Inc. (Mugar), filed an environmental notice

---

such proposed activity and its effect on the environment and without receiving and complying with an order of conditions and provided all appeal periods have elapsed. Said notice shall be filed . . . [with] the [local] conservation commission . . . [and] the department of environmental quality engineering."

"The conservation commission . . . shall hold a public hearing on the proposed activity within twenty-one days of the receipt of said notice."

"If after said hearing the conservation commission . . . determine[s] that the area on which the proposed work is to be done is significant to public or private water supply, to the ground water supply, to flood control, to storm damage prevention, to prevention of pollution, to protection of land containing shellfish, or to the protection of fisheries, such conservation commission . . . shall by written order within twenty-one days of such hearing impose such conditions as will contribute to the protection of the interests described herein, and all work shall be done in accordance therewith."

"[T]he applicant, any person aggrieved by said commission's order or failure to act, or any owner of land abutting the land upon which the proposed work is to be done, or any ten residents of the city or town in which such land is located, may, by certified mail and within ten days from said commission's order or failure to act, request the department of environmental quality engineering to determine whether the area on which the proposed work is to be done is significant to public or private water supply, to the ground water supply, to flood control, to storm damage prevention, to prevention of pollution, to protection of land containing shellfish, or to the protection of fisheries. The commissioner of environmental quality engineering or his designee also may request such a determination within said ten days. . . . Upon receipt of such request the department shall make the determination requested and shall by written order issue[d] within seventy days of receipt of such request, signed by the commissioner or his designee, impose such conditions as will contribute to the protection of the interests described herein . . . . Such order shall supersede the prior order of the conservation commission . . . and all work shall be done in accordance therewith."

"Rules and regulations shall be promulgated by the commissioner to effectuate the purposes of this section. However, failure by the commissioner to promulgate rules and regulations shall not act to suspend or invalidate the effect of this section."

form with the Executive Office of Environmental Affairs
(EOEA). See Massachusetts Environmental Policy Act
(MEPA), G. L. c. 30, §§ 61-62H (1984 ed.). In March, Mugar
filed with the conservation commission of the city of Attleboro
(ACC) a notice of intent to alter wetlands pursuant to the
WPA.[4] After a public hearing, the ACC authorized construction
of Mugar's project in May, 1979.[5] A group of ten Attleboro
residents then invoked their statutory right to have the commis-
sion's action reviewed by DEQE. Later, ownership of the
proposed project was transferred from Mugar to Attleboro Mall,
Inc., then an affiliate of the Edward J. DeBartolo Corporation
(DeBartolo). On April 21, 1982, DEQE's southeast regional
office[6] issued a superseding order which determined that
"[b]ecause of irreparable harm to several interests of the [WPA]
the project as proposed is denied." DeBartolo appealed to
DEQE's central office in Boston, claiming its right to a formal
adjudicatory hearing.

Formal hearings were not held, however, until more than
two years had passed. In the interim, in April of 1983, DEQE
adopted new regulations (1983 regulations) applicable to the
use of "bordering vegetated wetlands," one of the kinds of
land the applicant proposed to develop at Sweeden's Swamp.
See 310 Code Mass. Regs. § 10.55 (2) (1983) (definition of

---

[4] The "purpose of the project" as stated by Mugar was "[t]o develop the
site for the construction of a fully enclosed regional shopping mall, . . . in-
cluding roadways, parking areas, landscaped areas, ponds and storm water
retention areas and all pertinent site utilities . . . ." The project was to
encompass 74.6 acres of land on which stood "approximately" ten homes,
and from which "[e]xisting vegetation" was to be "removed" as the site
was "cut and filled" to accommodate what the judge characterized as "a
sprawling one-story mall building, roughly in the center of the site," sur-
rounded by parking areas whose construction would require "filling and
paving [of] a substantial portion of the remainder of the site."

[5] No issue as to the validity of the procedures before the ACC is raised
in this appeal.

[6] Pursuant to DEQE procedures at the time, initial requests for departmen-
tal review of local actions were addressed to, and decided informally by,
the department's regional offices. Statutorily defined parties aggrieved by
a decision of a regional office could then request a formal adjudicatory
hearing by DEQE.

bordering vegetated wetlands). In place of the regulations promulgated in 1978, which had permitted review of such wetlands proposals on a case-by-case basis, DEQE put in force what amounts to a per se rule; with exceptions not relevant here, the new rule prohibits approval of any proposal which results in the loss of more than 5,000 square feet of bordering vegetated wetlands. See 310 Code Mass. Regs. §§ 10.55 (3) and (4) (a)-(b) (1983) (prohibitions); 310 Code Mass. Regs. § 10.55 (4) (c) (1983) (exception).[7]

In DEQE's preface to its 1983 regulations, it is stated that "the interests of the [WPA] cannot be protected other than by leaving the existing wetland plant community intact." This is so because "while engineering solutions can protect the statutory interests at stake in most projects located in or near [some kinds of freshwater wetlands], this is not the case with bordering freshwater wetlands. The complex natural functioning of these wetlands cannot be replicated, and no amount of engineering will enable such areas to be filled or substantially altered without seriously impairing the statutory interests they serve."

According to the 1983 regulations themselves, however, the per se rule contained in §§ 10.55 (3) and (4) was to "take effect on April 1, 1983," 310 Code Mass. Regs. § 10.10 (1), and projects already in the regulatory pipeline were to be "grandfathered" by force of provisions barring application of the new rules "to any Notice of Intent filed prior to the effective date [April 1, 1983]." *Id.* This grandfather clause guaranteed that "[a]ll proceedings and actions commenced under the Act prior to the effective date" would go forward to the case-by-case review authorized "under the prior applicable regulations [the 1978 rules]." 310 Code Mass. Regs. § 10.10 (3) (1983).

---

[7] The removal of even so much as 5,000 square feet of such wetlands from their existing state is permitted only on condition that any area destroyed is "replaced" by wetlands artificially created in accordance with DEQE specifications. "Bordering Vegetated Wetlands are freshwater wetlands which border on creeks, rivers, streams, ponds and lakes." 310 Code Mass. Regs. § 10.55 (2) (1983). They involve "areas where ground water discharges to the surface and where, under some circumstances, surface water discharges to the ground water." 310 Code Mass. Regs. § 10.55 (1) (1983).

In December, 1983, DeBartolo conveyed the stock of Attleboro Mall, Inc., to the Newport Galleria Group, an affiliate of the Pyramid Companies of Syracuse, New York (Pyramid);[8] and Pyramid (hereafter, applicant) decided to proceed with the adjudicatory hearing originally sought by DeBartolo.[9] In May, 1984, it submitted revised plans for development of the mall at Sweeden's Swamp. The changes made were designed primarily to mitigate the adverse impact of the project with respect to the interests protected by the WPA.[10]

---

[8] By a letter dated December 8, 1983, the director of DEQE's division of wetlands protection, Roderick Gaskell, informed DeBartolo that its Attleboro Mall project "will continue to be reviewed under the previous (i.e. pre-April 1, 1983) Wetlands Regulations."

Pyramid maintains that it purchased the stock of Attleboro Mall, Inc., in reliance on Gaskell's letter. The plaintiffs have moved to strike Gaskell's letter from the record on the ground that it was not introduced in evidence in the adjudicatory hearing, and therefore it was included improperly in the record. If our decision turned upon an evaluation of the strength of the applicant's reliance on the applicability of the 1978 regulations, we would have to decide whether the letter is properly before us. In the view we take, however, Pyramid's claimed reliance on the Gaskell letter is not determinative. Thus, we need not decide the motion to strike.

[9] At a prehearing conference on January 4, 1984, a hearing officer granted motions to allow intervention by the plaintiffs, a number of citizens who reside near the proposed mall (citizens group), and by the Massachusetts Association of Conservation Commissions (MACC).

[10] The judge found that the following were "[a]mong the significant changes in [the] new plan": "1. The new plan contemplated a two-story building; 2. The plan attempted to reproduce or 'replicate' wetlands on the site to replace the substantial quantity of wetlands which would be destroyed by the construction project; 3. The plan attempted to control storm water run-off and pollution through the use of an 'exfiltration pad' under the mall; 4. The plan included wetlands areas not originally included as part of the project proposed by the Mugar Group; 5. The plan included additional land areas, creating new abutters; 6. The plan was predicated upon a different approach to the site's hydrology, configuration of drainage systems, storm water retention and detention, treatment of existing and proposed wetlands, and other elements directly related to interests protected by the Act."

The hearing officer had found that the inclusion of new wetlands was not significant because "these so called new wetlands are part of the same wetland systems affected by the project as originally submitted . . . notwithstanding any shift in property lines that previously had them technically outside the applicant's site."

On June 22, 1984, DEQE issued a superseding order of conditions in draft form which approved the project as revised. On August 8, 1984, the adjudicatory hearing commenced. Over fourteen days of hearings, the hearing officer considered expert testimony and documentary evidence relevant to the impact of the redesigned project on the following statutory interests: ground water protection, prevention of pollution, protection of drinking water, storm damage prevention, flood control, and protection of fisheries. While the hearings progressed, the applicant responded to criticisms by the plaintiffs' experts by proposing alterations to its plans.

On January 28, 1985, the hearing officer issued a tentative decision, concluding that "[t]he overall concept of this development is consistent with the protection of the interests of the Wetlands Protection Act." The hearing officer found that, while 70% of the water entering this 49.6 acre wetland now "leaves the site untreated" because it passes through by way of three major channels without making contact with the vegetation,[11] the applicant's plan would direct 100% of the entering water into contact with an artificially created 26.3 acre wetland whose herbaceous plants would be at least as efficient at filtration as the existing red maple swamp, and probably more so. In effect, the project as planned would replace a relatively large but inefficient wetland with one smaller in size but "more valuable . . . from a pollution attenuation point of view." Because he concluded that the techniques for creating herbaceous wetlands were tested and reliable, he found that "the applicant's plan with regard to wetlands replication is feasible and satisfies the interests of the [A]ct with regard to pollution control."

The hearing officer found that the current suitability of the aquifer for drinking wells was slight, but relevant. Although he found that "use of the proposed parking area will contribute to pollution loading . . . and decrease the overall ability of the project to prevent pollution," he concluded that the project's

---

[11] The nature of the swamp had been changed prior to the commencement, in 1979, of this proceeding, due to actions of other parties, e.g., the Commonwealth in the construction of Route I-95.

"mall pad" feature "will prevent contaminants from entering the groundwater from the parking lot" and that its design is "sufficient to protect the [statutory interests] in protection of ground water and drinking water, in addition to having a pollution attenuation function." Concerning the related statutory interests in prevention of flooding and storm damage prevention, he found that "no increased flooding will occur on site or off site during a worst case Type II 48 hour 100 year intensity storm, and there will be no increase in peak flow from the site in its developed condition." Concerning the statutory interest in protection of fisheries, the hearing officer found that, despite the regional office's finding of significant fisheries interests at Sweeden's Swamp, subsequent inquiries showed "no significant fisheries on site" nor downstream at Seven Mile River; and that the proposal will have, "if anything, a positive impact on fisheries."

The hearing officer added to the order of conditions a requirement that the mall's environmental function be monitored for at least five years following construction. He also recommended that DEQE retain "jurisdiction to order whatever remedial actions are necessary including measures to limit pollution loading of the wetland and the construction of water treatment facilities."

On March 13, 1985, the commissioner issued his final decision and order of conditions by which he adopted the hearing officer's decision and approved the applicant's revised plans. In response to the plaintiffs' principal legal objection, that the applicant's plans were so altered as to "constitute a new filing" and therefore to require de novo review by the filing of a new notice of intent with the ACC, the commissioner found that (a) remand to the local body would be pointless because the ACC had never sought remand after approving a plan which would have filled "all 50 acres" of the wetlands at issue, and (b) the plaintiffs sought a refiling of the case only to place its review under the new regulations which would prohibit wetland alterations of the size and scope contemplated here. While agreeing with MACC that "public comment on wetlands projects is

important," the commissioner saw no need for more public participation than the review process had already afforded. He characterized the revisions as "changes imposed by the Department," and stated that his staff knew of no case in which such changes had caused DEQE to require refiling.

As to the apparent inconsistency between the approval of the applicant's revised plans and the preface to DEQE's 1983 regulations, the commissioner observed that the per se rule in the 1983 regulations was reasonable because it served a purpose "to standardize decisions." In his view, a change of approach by DEQE was "especially important in the administration of the wetlands program, in which there are 351 different administering agencies — the city and town conservation commissions." The commissioner concluded, however, that "[i]t is not inconsistent for the Department to believe that as a general rule the filling of more than 5,000 square feet of bordering wetland will not protect the interests of the act and at the same time approve the filling of much more than 5,000 square feet when forced to apply the case by case method of analysis" to the "unusual" facts before it. The commissioner concluded that DEQE's promulgation and application of the "grandfather clause" was not at odds with the department's policy as stated in the preface to the 1983 regulations. Finally, the commissioner addressed an alleged contradiction between his decision and DEQE's own statement in the 1983 preface "that the functions served by bordering vegetated wetlands cannot be replicated in their totality by engineering means." He found that there was no contradiction in light of testimony from the director of DEQE's wetlands programs who had supervised preparation of the preface. In the director's opinion, the applicant's plan to create a substitute wetland relied not on "an engineering solution to replace the pollution attenuation and fisheries values of the existing wetland, but rather [on] a biological solution."

The plaintiffs appealed to the Superior Court in Suffolk County pursuant to G. L. c. 30A, § 14 (1). The judge issued his ruling on September 25, 1986. He found that the new plans contained "significant changes," see note 10, *supra*, but he neither explained the nature of their significance to the statutory

interests, nor did he find that DEQE had erred by not requiring the applicant to file a new notice of intent.[12] He did rule, however, that "the interests of the [WPA] cannot be protected other than by leaving the existing wetlands plant community intact," and that it was "error of law for DEQE to have grandfathered the new owners into the 1978 regulations, as they [*sic*] are diametrically opposed to the mandates of the 1983 regulations." It is from this decision that the applicant appeals, arguing that the Superior Court judge erred in holding as matter of law that DEQE was obliged to apply the requirements of its 1983 regulations retroactively. Because the plaintiffs argue that DEQE's decision cannot stand even if the judge erred, we shall discuss the merits of the judge's decision first; then we will analyze the plaintiffs' remaining concerns.

1. *The decision in the Superior Court.* The applicant argues, too broadly we think, that the judge erred when requiring retroactive application of new rules because, in its view, an agency is always entitled to limit new regulations to prospective application if, *in the agency's judgment,* retroactive application would be unfair to parties who have invested time and money, or otherwise altered their positions in reliance on the continuing applicability of old regulations. In support of this proposition, the applicant has cited numerous decisions in which Federal courts have upheld "grandfather clauses" as serving governmental purposes "legitimate" enough to withstand challenge under the equal protection clause of the Fourteenth Amendment to the United States Constitution. See *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456, 467-468 (1981); *New Orleans* v. *Dukes,* 427 U.S. 297, 303-306 (1976); *Sklar* v. *Byrne,* 727 F.2d 633, 640-642 (7th Cir. 1984); *Trafelet* v. *Thompson,* 594 F.2d 623, 631 & n.11 (7th Cir.), cert. denied, 444 U.S. 906 (1979). The judge, in his ruling, appears also to have relied on Federal case law. The judge stated, "In deciding the retroactive effect of newly adopted administrative rules, [re]viewing courts must look to the standard established by the

---

[12] We note that a change of ownership would not require that a new notice of intent be filed. See G. L. c. 131, § 40, fourth par.

Supreme Court in *SEC* v. *Chenery Corp.*, 332 U.S. 194, 203 (1947)." Additionally, the judge relied primarily on the tests set forth in *Sierra Club* v. *EPA*, 719 F.2d 436, 467-468 (D.C. Cir. 1983), cert. denied sub nom. *Alabama Power Co.* v. *Sierra Club*, 468 U.S. 1204 (1984).[13] In our view, since neither Federal constitutional nor statutory issues are involved on the facts of this case, the proper standard of judicial review is to be drawn from State law.

The relevant question here is whether the "grandfather clause" in the 1983 regulations violates the statutory mandate of DEQE as set forth in G. L. c. 131, § 40. We have held that courts should "not hesitate to overrule agency interpretations . . . [when they] are arbitrary, unreasonable or inconsistent with the plain terms of the [empowering statute]." *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976). Reliance interests are among the factors that agencies properly may consider when promulgating or applying rules in the context of the agency's statutory mandate.

When the judge ruled that DEQE erred as matter of law in grandfathering the applicant's project, he effectively substituted his own judgment, that grandfathering is "diametrically opposed to the mandates of the 1983 regulations" and the statutory mandate, for DEQE's determination to the contrary. The propriety of that substitution, of judicial judgment for administrative determination, is doubtful. "We give substantial deference to the construction placed on a statute . . . by the agency charged with its administration," *Manning* v. *Boston*

---

[13] The judge elected to analyze the question by reference to four criteria recently developed in the United States Court of Appeals for the District of Columbia Circuit, viz.: "[1] whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, [2] the extent to which a party against whom the new rule is applied relied on the former rule, [3] the degree of the burden which a retroactive order imposes on a party, and [4] the statutory interest in applying a new rule despite the reliance of a party on the old standard." *Sierra Club* v. *EPA, supra* at 467. In the view we take, the first three factors are irrelevant to this appeal. While we agree that the "statutory interest" is of crucial significance, we do not agree that the 1983 regulations (and their ban on filling more than 5,000 square feet of any bordering vegetated wetland) were statutorily compelled.

*Redevelopment Auth., ante* 444, 453 (1987); and deference is especially appropriate where the Legislature "has seen fit to delegate broad rulemaking authority to the [agency]." *Natural Resources Defense Council, Inc.* v. *SEC,* 606 F.2d 1031, 1050 (D.C. Cir. 1979). Accord *SEC* v. *Chenery Corp.,* 332 U.S. 194, 208 (1947) (where statutory grant of substantive administrative discretion is broad, reversal of agency's judgment is warranted only when abuse of discretion is "plain"). As we have noted in another context, "[i]t is significant that [the WPA] is entirely 'procedural' in that it [only] prescribes the steps to be taken before any dredging or landfill activities may be conducted in certain wetland areas." *Boston* v. *Massachusetts Port Auth.,* 364 Mass. 639, 647-648 n.10 (1974).

The Act "does not lay down absolute use prohibitions." *Coons* v. *Carstensen,* 15 Mass. App. Ct. 431, 435 (1983). It vests in DEQE precisely that "broad authority to effectuate [its] purposes" which commands judicial deference. *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 524 (1979). Where deference of this kind is due, a reviewing court must treat DEQE's regulations, including 310 Code Mass. Regs. §§ 10.10 (1) and (3) (the grandfather clause), as presumptively rational "and not declare [them] void unless [their] provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Id.* at 525, quoting *Consolidated Cigar Corp* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977). "[N]o more need be discerned than some rational relation between the regulation and the empowering statute." *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries,* 380 Mass. 471, 477 (1980).

In this case, the range of potentially rational regulations is quite broad because the WPA requires no more of DEQE than that it "impose such conditions [on landfill projects affecting wetlands] as will contribute to the protection of the interests described . . . [in the Act, to the end that] all work [on such projects] shall be done in accordance therewith." G. L. c. 131, § 40 (1984 ed.). Although the protected interests are stated with some specificity, see note 3, *supra,* the statute is silent with respect to what may or may not constitute "protection."

Into this silence, the judge read the language of the 1983 preface, "that the interests of the Act cannot be protected other than by leaving the existing wetland plant community intact." He concluded that the "near prohibition" in the 1983 regulations on the filling of bordering vegetated wetlands "becomes essential to performance by DEQE of its lawful obligation," and any "different course constitutes irresponsibility." He erred, however, in not giving due deference to DEQE's determination that the grandfather clause is not inconsistent with the language of the preface or the statutory mandate.

As to the language of the preface, we think it just as reasonable to read it, in light of the regulations it explains, as meaning by its reference to the "existing wetland plant community" that portion of the State's wetlands which would be kept essentially "intact" *by* the new regulations, i.e., those wetlands not subject in 1983 to a notice of intent. Nor do we perceive that the presence of the grandfather clause in the 1983 regulations was in any way violative of the statutory mandate. The WPA does not command DEQE to protect all wetlands from all development. Rather, it commands the agency to condition all work on wetlands so as to protect the statutory interests in prevention of pollution, flooding, and storm damage, and in preservation of water supplies and wildlife. Even though the 1983 regulations which prospectively bar case-by-case review of development proposals may be reasonable (a point which we need not decide), it remains true that a grandfather clause carrying forward the prior approach allowing case-by-case review may also be within the statutory mandate. To the extent that a grandfather clause permits case-by-case review where a project is already in the administrative pipeline, such an approach may also be reasonable because DEQE properly may determine, on the basis of its knowledge of the number and nature of the projects in its pipeline, that such grandfathering will not be so administratively burdensome as to prevent effective, efficient protection of the statutory interests. When consideration is given to the additional facts that, by virtue of being grandfathered, the applicant's project did not escape review, and that none of the hearing officers' favorable findings was chal-

lenged by the judge, it is clear that DEQE's actions have been consonant with the statutory mandate. Accordingly, we hold that the judge's nullification of DEQE's decision was error.

2. *The plaintiffs' remaining objections.* What we have said effectively answers most of the questions raised by the plaintiffs. In its amicus brief MACC argues that even if, as a procedural matter, the applicant is entitled to review under the 1978 regulations, DEQE's decision to allow filling at Sweeden's Swamp was erroneous. MACC contends that the rule making process which culminated in the 1983 regulations shows that DEQE had concluded that "except in limited circumstances expressly set forth, *no wetlands that border bodies of water may be altered by any project*" (emphasis in original). DEQE's actual conclusion was very different. Contrary to MACC's view, DEQE did not determine in 1983 that case-by-case review was incapable of determining whether, in an individual case, filling or alterations of wetland might be consistent with protection of the statutory interests.[14] Nothing in G. L. c. 131, § 40, sustains this view. It is primarily to the statute that we look to determine the proper range of an agency's power to shape regulations. Additionally, to the extent we give deference to the agency's decision, the deference is to the regulations as they were promulgated, including the grandfather clause.

We note also that DEQE has expertise, not only with respect to what conditions will protect the statutory interests in a given case but also with respect to what adjudicatory techniques will be administratively feasible in service of those interests. DEQE

---

[14] The citizens' group argues, to the contrary, that adoption of the 1983 regulations amounted not merely to a procedural change but to adoption of the substantive policy position that nothing short of an absolute ban on large-scale development is consistent with protection of the statutory interests. To support this contention, the group points to DEQE's stated conclusion in the preface "that destruction of bordering vegetated wetlands must be curtailed if the interests identified in the Act are to be protected." To "curtail," however, is not to prohibit absolutely but to "diminish," "lessen," or "reduce." Webster's New Int'l Dictionary 558 (2d ed. 1959).

had discretion to decide that the general rule need not apply to projects already in development and in process of review. Additionally, the hearing officer found, on the basis of substantial evidence, that the existing wetland does not function efficiently in service of the statutory interests. He found further that the project, as planned, would result in creation of an environmental entity whose "functioning" would be "biological," that is to say, "natural." That the feasibility of recreating functional wetlands was debated by the experts who testified is not a ground for reversal.

The plaintiffs also argue that the judge erred in not requiring the applicant to seek de novo review by filing a new notice of intent with the ACC.[15] By the literal terms of the WPA, anyone planning to "alter" a wetland must file a notice of intent with local authorities including "such plans as may be necessary to describe such proposed activity and its effect on the environment." G. L. c. 131, § 40 (1984 ed.).

The hearing officer decided, pursuant to the terms of § 10.06 (5) of the 1978 regulations, that the revisions did not amount to such a "significant change of the activity" as to "require a new filing,"[16] because (1) it had been DEQE's practice not to remand to the local level so long as "the general intent of a proposal [as here, to build a mall in Sweeden's Swamp] remains the same"; (2) the WPA contemplates changes subsequent to initial filings and vests final authority to approve plans in DEQE; (3) local opponents were not denied a full opportunity to oppose the revised proposal; and (4) the design changes were intended to reduce the adverse environmental impact of the project below the levels already approved by a local conservation commission which had not sought remand.

---

[15] The plaintiffs candidly acknowledge that a decision to require notice would scuttle the project.

[16] The 1978 regulation provided: "If there is a significant change of the activity . . . , the [reviewing agency] may require a new filing of a Notice of Intent." 310 Code Mass. Regs. § 10.06 (5) (1978). The plaintiffs do not suggest that a "significant change" test was the wrong standard to apply, but rather that the right test was wrongly applied.

The judge, on the other hand, characterized the revisions as "significant," and he referred to the plans as "new"; but, despite the plaintiffs' contention to the contrary, the judge did not find that DEQE had erred by misapplying § 10.06 (5). The word "significant" is defined in the regulations to apply to a wetland which "plays a role in the provision or protection of an interest of the Act." 310 Mass. Regs. § 10.02 (42) (1978) (defining "[s]ignificant"). See also 310 Code Mass. Regs. § 10.04 (1983) (same). This definition was promulgated, not for use in the context of § 10.06 (5), but for use when the agency must determine whether it has *jurisdiction* to determine, in the words of the statute, that "the area on which the proposed work is to be done is significant" to protection of enumerated environmental interests. Where jurisdiction is concerned, it is clearly apt for DEQE to define "significant" broadly, as it is clear the Legislature intended to place within DEQE's protective purview any wetland which, in DEQE's opinion, might play a role in flood control or the prevention of pollution.

However, after DEQE has taken jurisdiction, the question changes to that of whether the statute requires similar breadth in defining the change which may mandate remand for local reconsideration. We think it does not, for the result would be to deny to DEQE the exercise of discretion which is so clearly contemplated by G. L. c. 131, § 40, and by § 10.06 (5) of the 1978 regulations.

Additionally, as stated by the Appeals Court in *Hamilton* v. *Conservation Comm'n of Orleans,* 12 Mass. App. Ct. 359, 368 (1981), "it is apparent that the Legislature has assigned to local authorities acting under [the WPA] the role of making an initial review of an application for the familiar purposes of bringing local knowledge to bear on local conditions and reducing the administrative burden on a Statewide agency." While the statute requires that the notice which triggers local review must include "such plans as may be necessary to describe [the] proposed activity and its effect on the environment," the statute nowhere intimates that all subsequent proceedings under the Act must remain directed to the specific plans initially filed with local authorities. Moreover, the statute contains several

indications to the contrary, for it empowers DEQE to review any local determination sua sponte, and to issue orders "supersed[ing]" any orders issued locally. Implicit in this power of DEQE is a power to revise, or to request revisions, and to approve them when appropriate.

The question is whether the statutory requirement of bringing local knowledge to bear on local conditions is inadequately protected when DEQE permits altered plans to go forward to final approval without remand for additional local review. While the changes submitted to DEQE were not scrutinized locally and are undeniably "substantial" in terms of environmental effect, these same changes were found by DEQE to reduce the adverse environmental impact of a project previously approved on the local level.[17]

We note that local residents and officials have had an opportunity to be heard by way of a public hearing and to apply local knowledge by way of initial approval. Local opponents have been heard at length during the process of review. We attach some importance to the Legislature's presumed intent that the DEQE's review procedures operate efficiently in individual cases, so the WPA's Statewide mandate may be effectively implemented. Obviously, if a change or set of changes is meaningful enough to win DEQE's approval, those changes must be substantial in terms of their environmental impact. We cannot conclude that the Legislature intended to burden every meaningful change in an applicant's proposal with de novo review, regardless whether or not the change was one as to which the process of review might benefit from local participation. See *Wolbach* v. *Beckett,* 20 Mass. App. Ct. 302, 307 (1985) (nothing in § 40 requires local participation as condition precedent to determination by DEQE).

---

[17] We are not presented with the circumstance where a locally approved project is altered so as probably to increase its adverse impact; nor do we address the situation where a locally disapproved project is altered to decrease its adverse impact. We do not decide whether remand to the local commission would be required by the statute in such cases. For general discussion of the history of G. L. c. 131, § 40, and the role of local conservation commissions in the statutory scheme, see *Hamilton* v. *Conservation Comm'n of Orleans, supra.*

In this case, the interveners have not attempted to demonstrate, except in the most speculative and conclusory ways, how remand could improve the process. Implicit in DEQE's position is the insight that, where local authorities have seen fit, on the basis of local understanding of local conditions, to approve wholesale destruction of a local wetland, the process of review is not likely to be meaningfully informed by remand for local consideration of proposals not so destructive, and indeed the likely consequence of such remand would be needless delay. Since unnecessary delay is not what the Legislature could rationally have intended, we do not read the WPA to require such delay.

Last, there remains the question whether the applicant's plans were in fact less destructive or more protective of statutory interests than the plans approved locally. On this point, we defer to DEQE's expertise and review only to determine whether its decision was supported by substantial evidence. See *Wolbach* v. *Beckett, supra; Raytheon Co.* v. *Director of the Div. of Employment Sec.*, 364 Mass. 593, 595-596 (1974). While the testifying witnesses disagreed concerning the feasibility of the applicant's proposal, there was ample evidence to support the conclusion that the proposal is workable and substantially more protective of statutory interests than the plans they replaced. In these circumstances, no new notice of intent could have served any statutory purpose.

The judgment of the Superior Court is reversed, and the case is remanded to the Superior Court for entry of a judgment affirming the decision of DEQE.

*So ordered.*